**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| REBEKAH L. BARKHAUER, | CASE NO. 5:24-CV-00560 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Rebekah L. Barkhauer ("Plaintiff" or "Ms. Barkhauer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 13.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.     Procedural History

On November 22, 2021, Ms. Barkhauer filed applications for DIB and SSI, alleging a disability onset date of December 31, 2014. (Tr. 10, 261-71.) She alleged disability due to attention deficit hyperactive disorder ("ADHD"), anemia, anxiety, asthma, De Quervain's disease, depression, fibromyalgia, irritable bowel syndrome, migraines, and post-traumatic stress disorder ("PTSD"). (Tr. 84, 98, 147, 163, 290.) Ms. Barkhauer's applications were denied at the initial level (Tr. 10, 143-52) and upon reconsideration (Tr. 10, 159-66), and she requested a

1

hearing (Tr. 10, 177-78).  On May 16, 2023, a telephonic hearing was held before an

Administrative Law Judge ("ALJ").  (Tr. 47-83.)

On May 25, 2023, the ALJ issued a decision, finding Ms. Barkhauer has not been under a

disability within the meaning of the Social Security Act from December 31, 2014, through the

date of the decision.  (Tr. 7-34.)  Ms. Barkhauer sought review of the decision by the Appeals

Council.  (Tr. 259-60.)  On February 7, 2024, the Appeals Council found no reason to review the

decision, making the May 25, 2023 decision the final decision of the Commissioner.  (Tr. 1-5.)

On March 26, 2024, Ms. Barkhauer filed a Complaint challenging the Commissioner's

final decision denying her social security disability benefits.  (ECF Doc. 1.)  The matter is fully

briefed.  (ECF Docs. 8, 10, & 11.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Barkhauer was born in 1988.  (Tr. 27, 50, 265.)  She lived with her spouse on their

friend's property.  (Tr. 56.)  She completed one year of college and a career training program for

dog grooming.  (Tr. 57, 291.)  Her past jobs included pharmacy tech and dog groomer.  (Tr. 58-

60.)  Her last work attempt was in 2019, when she tried to work for a few months at a humane

society but stopped working due to her medical conditions.  (Tr. 57-58, 291.)

### B.      Medical Evidence

#### 1.      Relevant Treatment History

##### i.      Physical Impairments

On April 4, 2016, Ms. Barkhauer presented to Brian Vereb, CNP, in the neurology

department at the Cleveland Clinic.  (Tr. 489.)  She complained of a severe headache,

generalized overall weakness, intermittent vertigo, heart palpitation, cognitive decline, severe

daytime fatigue, severe joint pain, difficulty grasping, dropping objects, difficulty walking and

moving, frequent falls, anxiety, and feeling faint.  (*Id*.)  She reported that "absence seizures" started in 2008 and that a previously completed EEG and CAT scan were unrevealing.  (*Id*.)  She reported a history of bad migraines since she was in eighth grade and said she was taking gabapentin for them.  (*Id*.)  She had tried Topamax, propranolol, Imitrex, and Flexeril for her migraines and pain.  (*Id*.)  Ms. Barkhauer's physical examination revealed generalized weakness in all extremities, positive Hoffman's sign, increased sensitivity in the left hand and right forearm, abnormal reflexes (3+) on the right and left side, very severe paraspinal tenderness from the cervical region down to the lumbar region, and an abnormal gait (right side limp).  (Tr. 490.) Her examination also revealed no cranial nerve deficit, no atrophy, no tremor, normal cerebellar exam, and normal speech, and she was not agitated or disoriented.  (*Id*.)  Her memory, affect, and judgment were normal.  (*Id*.)  She was diagnosed with: migraine with aura, intractable, with status migrainosus; daytime sleepiness; recurrent falls while walking; benign paroxysmal positional vertigo, unspecified laterality; fibromyalgia; and posterior neck pain.  (*Id*.)

On April 22, 2016, Ms. Barkhauer presented to Kristin Havens, CNP, at Akron General Health and Wellness, complaining of an upper respiratory infection.  (Tr. 484.)  During her visit, she reported having an intractable migraine with no aura since February.  (Tr. 485.)  She also reported a history of fibromyalgia.  (*Id*.)  She said she previously owned a dog grooming business but quit due to her migraines.  (*Id*.)  She denied myalgias, dizziness, tingling, and weakness.  (*Id.*)  CNP Havens prescribed Prednisone for the acute bronchitis and mild intermittent asthma with acute exacerbation. (Tr. 486.)

On April 26, 2016, an EEG was performed to assess Ms. Barkhauer's seizures.  (Tr. 484.) The results were normal with no clear seizure or epileptiform activity seen.  (*Id*.)

3

On February 27, 2017, Ms. Barkhauer presented to Mark Pellegrino, M.D., at Ohio Pain and Rehab Specialists for follow up.  (Tr. 360.)  She complained of pain and increased weakness and fatigue.  (*Id.*)  She also complained of more frequent migraines and reported that she was hospitalized two weeks earlier due to a migraine.  (*Id.*)  She said the pain was in multiple areas of her body and described the pain as stabbing, throbbing, shooting, and aching; she rated her pain level a six out ten.  (*Id.*)  She said her pain had been so intense that it had significantly impacted her daily activities.  (*Id.*)  She also said her pain improved with rest, reclining, sitting, and ice. (*Id.*)  She reported associated numbness, tingling, weakness, and migraines.  (*Id.*)  Her body mass index (BMI) was 32.95.  (Tr. 362.)  An examination revealed normal range of motion without joint swelling, normal strength, an abnormal gait, pain to palpation in the spine with normal range of motion, 18/18 fibromyalgia tender points, and positive Hoffman's.  (Tr. 362-63.) Ms. Barkhauer's mood was euthymic, and an appropriate affect was observed.  (Tr. 363.)  Dr. Pellegrino found that Ms. Barkhauer's examination did not reveal significant neurological findings or acute inflammation.  (Tr. 363.)  He observed that she did have diffuse pain, chronic pain behaviors, and features of conversion disorder.  (*Id.*)  Dr. Pellegrino also concluded that MS could be a cause of chronic pain syndrome and conversion disorder and could be consistent with some of her symptoms and therefore recommended a brain MRI to evaluate for demyelinating disease.  (Tr. 363-64.)  Given the examination findings, Dr. Pellegrino informed Ms. Barkhauer that he could not endorse disability, the need for a service dog, use of a cane, or use of help from her family members with transfers.  (Tr. 364.)  But he recommended the MRI and some labs for further evaluation.  (*Id.*)

On May 3, 2017, Ms. Barkhauer presented to CNP Havens, complaining of a rash starting the week before.  (Tr. 472.)  Ms. Barkhauer mentioned she had been working outside with brush.

(*Id.*)  She reported that her rash was worsening and spreading up her legs onto her upper body, and that her asthma was slightly exacerbated.  (*Id.*)  Her last seizure occurred the month before and lasted about an hour; she felt out of it, with trembling on her right side.  (*Id.*)  Her physical examination showed normal range of motion, reflexes, coordination, and gait and no cranial nerve deficit.  (Tr. 473-74.)  Her mood, memory, affect, and judgment were normal.  (Tr. 474.)  She was diagnosed with poison ivy, seasonal allergic rhinitis, and stable mild intermittent asthma without complication, and advised to avoid asthma triggers.  (*Id.*)

On August 10, 2017, Ms. Barkhauer returned to CNP Havens for a checkup.  (Tr. 465.)  She complained of periods of loss of awareness / seizures that were occurring four to five times weekly and lasting five to eight minutes.  (*Id.*)  She reported one episode had lasted thirty minutes.  (Tr. 466.)  She said the episodes involved blank staring, numbness around her mouth, dizziness, slower speech, tremors, shaking, convulsing, and/or jerking movements.  (Tr. 465, 466.)  She reported feeling very fatigued after an episode occurred and sleeping for a while, with fatigue typically lasting for 24 hours.  (*Id.*)  She reported missing work as a result of the episodes.  (*Id.*)  She was taking gabapentin for her fibromyalgia with a recent increase in the dosage.  (*Id.*)  She also reported experiencing other symptoms, including headaches, dizziness, intermittent tinnitus, and paresthesias of the hands and face.  (*Id.*)  It was noted that a brain MRI had been ordered in the past, but insurance had denied coverage.  (Tr. 466.)  She said she had been seeing Brian Vereb in neurology for her migraines, but she was interested in seeing a new neurologist.  (*Id.*)  Ms. Barkhauer's physical examination findings were unremarkable, including normal range of motion, no tenderness, normal sensation, strength, and reflexes, and normal gait.  (Tr. 467-68.)  CNP Havens assessed seizure-like activity, ordered an MRI and lab work, prescribed Keppra, and instructed Ms. Barkhauer to continue gabapentin and follow up with Dr.

Boutros in neurology.  (Tr. 468.)  CNP Havens also assessed unspecified fatigue, unspecified headache, paresthesia, dizziness, and claustrophobia.  (*Id*.)  Ms. Barkhauer's August 16, 2017 brain MRI was negative.  (Tr. 530-31.)

On September 20, 2017, Ms. Barkhauer presented to neurologist Dina Boutros, M.D., for her headaches.  (Tr. 460.)  Dr. Boutros noted that an August 16, 2017 MRI of the brain was negative for any lesion and an April 26, 2016 EEG was normal (Tr. 460, 530-31.)  Ms. Barkhauer reported she was doing well on Keppra, and denied seizures unless she missed a dose.[1]  (Tr. 460-61.)  She said she was still unable to work but could take her dog out.  (Tr. 461.)  Ms. Barkhauer's physical examination revealed generalized weakness in all extremities, positive Hoffman's sign, increased sensitivity in the left hand and right forearm, abnormal reflexes (3+) on the right and left side, very severe paraspinal tenderness from the cervical region down to the lumbar region, and an abnormal gait (right side limp).  (Tr. 463.)  Her examination also revealed no cranial nerve deficit, no atrophy, no tremor, normal cerebellar exam, and normal speech; she was not agitated or disoriented.  (*Id*.)  Her memory, affect, and judgment were normal.  (*Id*.)  Dr. Boutros's diagnoses included: migraine with aura, intractable, with status migrainosus; benign paroxysmal positional vertigo, unspecified laterality; and fibromyalgia.  (*Id*.)

On January 3, 2018, Ms. Barkhauer presented to Erik Modlo, M.D., in the internal medicine department at the Cleveland Clinic, complaining of fatigue and abdominal pain.  (Tr. 454.)  She denied pain, loss of range of motion, headaches, tremors, dizziness, vertigo, memory loss, confusion, weakness, numbness, or tingling.  (Tr. 456-57.)  Her BMI was 31.28.  (Tr. 457.)  Examination findings were unremarkable.  (Tr. 457.)  Dr. Modlo referred her to gastroenterology for follow up regarding the abdominal pain.  (Tr. 457-58.)  He refilled Ms. Barkhauer's Keppra,

---

[1] During a counseling session on August 22, 2017, Ms. Barkhauer also stated that since starting Keppra she only had seizures if she missed a dose of her medication.  (Tr. 669.)

noting there was no seizure activity during the previous six months, and recommended that Ms. Barkhauer follow up with neurology if she continued to have seizure-related concerns.  (Tr. 458.)

During an October 5, 2018 follow-up visit with Dr. Modlo, Ms. Barkhauer reported increased stress secondary to helping care for her 12-year-old niece.  (Tr. 440.)  She said she was taking Keppra 500 mg twice each day and gabapentin 800 mg three times each day, but she said she typically missed her midday gabapentin dose due to somnolence.  (*Id*.)  She reported that she felt disconnected at various times during the week and felt like she was going to black out.  (*Id*.)  She felt increasingly tired after an episode and had to nap for five minutes to one hour.  (Tr. 440-41.)  Until recent worsening of her symptoms, she said she had gone months between symptoms.  (Tr. 441.)  She denied respiratory complaints, back pain, joint swelling, myalgias, dizziness, tremors, numbness, and headaches.  (*Id*.)  Dr. Modlo reminded her not to skip medication since doing so could predispose her to seizures.  (Tr. 441.)  He increased her Keppra dose to 750 mg twice a day and encouraged her to take her midday dose of gabapentin, suggesting that if she was too sedated taking an 800 mg dose, she might be able to take half of the tablet to reduce potential sedation.  (*Id*.)  In addition to diagnoses of seizures and episodes of altered consciousness, Ms. Barkhauer was diagnosed with obesity.  (*Id*.)  Dr. Modlo encouraged a healthy diet and regular exercise, consisting of thirty minutes of aerobic exercise five times per week.  (*Id*.)

On April 10, 2019, Ms. Barkhauer presented to Niharika Sharma, M.D., a rheumatologist at the Cleveland Clinic, for complaints of increasing joint and muscle pain.  (Tr. 1151-57.)  She also complained of fatigue, shortness of breath, and chronic migraines.  (Tr. 1151-52.)  She reported that her fatigue and muscle weakness and pain waxed and waned and flared up at different times over the past several years.  (Tr. 1151.)  Her BMI was 34.61 (Tr. 1155) and she reported that her weight had fluctuated throughout her life (Tr. 1151).  Ms. Barkhauer's physical

examination was generally normal, but there was tenderness to palpation of the distal interphalangeal (DIP) joints, proximal interphalangeal (PIPS) joints, and left knee medial patellar. (Tr. 1156.) Ms. Barkhauer was diagnosed with joint pain at multiple sites, malaise and fatigue, fibromyalgia, and Sicca syndrome, unspecified. (*Id*.) Dr. Sharma ordered labs and x-rays, noting that her symptoms could be related to underlying fibromyalgia, anxiety, and depression, but that autoimmune diseases should be ruled out. (*Id*.)

Ms. Barkhauer returned to Dr. Sharma on May 13, 2019, for follow up. (Tr. 420.) She reported more diffuse myalgia and arthralgia due to weather changes. (*Id*.) Physical examination findings were similar to findings from her April visit with Dr. Sharma, except there was no tenderness in the joints. (*Compare* Tr. 422-23 *with* Tr. 1155-56.) Dr. Sharma noted that x-rays of Ms. Barkhauer's bilateral hands and knees were negative, Ms. Barkhauer's comprehensive rheumatological evaluation was negative, and there were no signs of autoimmune disease. (Tr. 423.) Ms. Barkhauer was diagnosed with pain in the joints at multiple sites, malaise and fatigue, and fibromyalgia. (*Id*.) Dr. Sharma discussed daily exercise with Ms. Barkhauer and Ms. Barkhauer said she was interested in trying swimming. (*Id*.) Dr. Sharma also noted that Ms. Barkhauer's iron was low and recommended that Ms. Barkhauer discuss this with her primary care physician. (*Id*.)

On June 14, 2019, Ms. Barkhauer returned to Dr. Modlo for follow up. (Tr. 417.) It was noted that rheumatologic disorders had been ruled out and Ms. Barkhauer was on treatment for fibromyalgia. (*Id*.) Ms. Barkhauer reported that she continued to have muscle pains and aches, fatigue, and swollen joints, but she was not interested in changing her treatment. (*Id*.) She said she did not formally exercise but was active with chores at home and wanted to start swimming. (*Id*.) They discussed Ms. Barkhauer's iron deficiency and her interest in iron infusions rather

8

than supplements because iron supplements had made her sick to her stomach in the past.  (*Id.*)

She denied headaches.  (*Id.*)  Her BMI was 34.61.  (Tr. 419.)  Ms. Barkhauer's physical

examination was generally normal, including normal range of motion in the neck, no edema, and

normal gait.  (*Id.*)  Dr. Modlo recommended iron infusions, noting that her iron deficiency could

be contributing to her extreme fatigue and exacerbating her fibromyalgia symptoms.  (Tr. 420.)

In addition to iron deficiency, Ms. Barkhauer was diagnosed with stable mild intermittent asthma

without complication, and was advised to avoid triggers.  (*Id.*)

On January 29, 2022, Ms. Barkhauer presented to the emergency room at Alliance

Community Hospital with seizure-like activity.  (Tr. 1077-78.)  She said she was in the car and

her arms felt heavy, she became short of breath, and her arms and legs started shaking.  (Tr.

1077.)  She reported that the episode lasted a few minutes and resolved on its own.  (*Id.*)  She

was able to talk throughout the episode.  (*Id.*)  She said she took Keppra for her seizures and

reported missing a dose that morning.  (*Id.*)  She had missed other doses in the past.  (*Id.*)  She

reported feeling tired and shaky, but otherwise back to her normal self.  (*Id.*)  She denied

respiratory symptoms, chest pain or palpitations, pain in the abdomen, neck, back, or shoulder,

headache, weakness, and numbness.  (*Id.*) Her physical examination revealed normal respiratory

and cardiovascular findings and normal range of motion, strength, and sensation.  (*Id.*)  There

was a low suspicion for a seizure due to Ms. Barkhauer's reported ability to talk during the

episode.  (Tr. 1078.)  There were no neurologic deficits on examination, so a CT scan was not

ordered.  (*Id.*)  She was discharged home in good condition with a referral to the neuro care

center and instructions to return to the emergency room if symptoms worsened.  (*Id.*)

On March 10, 2022, Ms. Barkhauer presented as a new patient to Nikita Hegde, M.D., at

Cleveland Clinic's Arthritis & Rheumatology department for her history of fibromyalgia, benign

joint hypermobility syndrome, and generalized pain.  (Tr. 1127.)  She complained of pain in her hands, back, and knees, with intermittent swelling in her right second and third knuckles.  (*Id*.) She reported morning stiffness for at least an hour, noting some improvement with chiropractic treatments.  (*Id*.)  She reported fatigue and a history of iron deficiency, with her last iron infusion in 2019.  (*Id*.)  She reported shortness of breath but denied wheezing.  (Tr. 1131.)  She also denied headaches, dizziness, fainting, and muscle spasm.  (Tr. 1132.)  Her BMI was 36.44.  (Tr. 1132.)  Her motor and sensory examinations were normal, as were her tone, gait, power, and coordination, but here was mild tenderness in the first and fourth metacarpophalangeal (MCP) joints, right sacroiliac (SI) joint, and right ankle.  (*Id*.)  There was hypermobility in the elbows, knees, and thumbs.  (*Id*.)  X-rays of the cervical and lumbar spine and SI joints were normal. (Tr. 1134.)  Ms. Barkhauer was diagnosed with inflammatory spondylopathy of multiple sites in the spine, fibromyalgia, fatigue, iron deficiency anemia, seizure, and a B12 deficiency.  (Tr. 1135.)  Dr. Hegde's recommendations included lab work, regular exercise, heat, massage, anti-inflammatories as needed, and a follow up in three to four months.  (*Id*.)

On March 17, 2022, Ms. Barkhauer presented to cardiologist Zenab Laiq, M.D., at Akron General Health & Wellness for evaluation of palpitations, chest pain, and episodes of syncope. (Tr. 1168-69.)  She reported episodes of lightheadedness, tunnel vision, and altered consciousness, resulting in loss of consciousness with falls over the past couple of years.  (Tr. 1169.)  She reported at least two to three of these episodes each year.  (*Id*.)  She reported having a Holter monitor in January 2022 that did not reveal any arrhythmias.  (*Id*.)  She reported chest pain that occurred with and without palpitations and a history of fibromyalgia with associated chronic pain.  (*Id*.)  She reported taking Keppra for her seizure disorder, but said she was not following with a neurologist.  (*Id*.)  She reported occasional shortness of breath and chronic pain

in multiple areas of her body.  (Tr. 1171.)  Her examination findings were generally

unremarkable, and an EKG showed normal sinus rhythm with no suggestion of ischemia or

infarction.  (*Id*.)  Dr. Laiq recommended: an echocardiogram to rule out structural or valvular

heart disease; an exercise stress test without imaging for workup of chest pain, with notations

that Ms. Barkhauer's pain was atypical, that there was low suspicion for coronary artery disease,

and that it was possible her chest pain was due to her underlying fibromyalgia; and that Ms.

Barkhauer follow up and establish with a neurologist for further evaluation to confirm that her

episodes of altered consciousness were not due to seizure activity.  (Tr. 1171-72.)

 An exercise stress test performed on May 24, 2022, was normal.  (Tr. 1483-86.)  Ms.

Barkhauer also had a transthoracic echo performed on May 24, 2022, which showed no

significant valvular abnormalities.  (Tr. 1487-89.)

 On August 10, 2022, Ms. Barkhauer returned to Dr. Hegde for follow up.  (Tr. 1662-63.)

She reported her pain was a nine out of ten, with increased pain in her lower back, knees, feet,

and numbness in her hands, but no swelling.  (Tr. 1662.)  She reported morning stiffness for

thirty to forty-five minutes.  (*Id*.)  She was taking naproxen as needed.  (*Id*.)  She had not

recently had an iron infusion.  (*Id*.)  She reported unexplained weight loss of thirty to forty

pounds.  (*Id*.)  Her blood work from March 2022 showed her HLA-B27 was negative.  (*Id*.)

She reported shortness of breath but denied wheezing.  (Tr. 1662.)  She denied headaches,

dizziness, fainting, and muscle spasm.  (Tr. 1663.)  Her BMI was 34.71.  (*Id*.)  Ms. Barkhauer's

examination revealed: diffuse tenderness over all small joints of the hands; hypermobility of the

elbows, knees, and thumbs; normal tone, gait, coordination; and normal respiratory findings.

(Tr. 1663-64.)  Dr. Hegde referred Ms. Barkhauer to physical therapy, noting that an MRI of the

SI joints was recommended but insurance required physical therapy.  (Tr. 1665.)  Dr. Hegde's

recommendations also included: checking iron levels; naproxen as needed; pain management; and continued use of Vitamin D daily supplement. (*Id*.)

On September 12, 2022, Ms. Barkhauer returned to Dr. Laiq for follow up. (Tr. 1636.) Dr. Laiq noted that Ms. Barkhauer's echocardiogram and stress test were mostly unremarkable. (*Id*.) Ms. Barkhauer's BMI was 33.61. (Tr. 1638.) Her physical examination findings were unremarkable. (*Id*.) Dr. Laiq concluded that Ms. Barkhauer's symptoms could not be explained by a cardiac diagnosis and recommended that Ms. Barkhauer follow up with neurology to confirm the diagnosis of seizure disorder and determine if any of her symptoms could be explained by seizures. (Tr. 1638-39.) Dr. Laiq noted it was possible Ms. Barkhauer had orthostatic intolerance, and recommended liberalizing fluid intake, making careful changes in position, and following an exercise routine. (Tr. 1639.)

On September 20, 2022, Ms. Barkhauer presented to Brandy Mansfield, APRN, CNP, in the pain management department at Akron General. (Tr. 1627-31.) She reported arthralgias, back pain, gait problems, joint swelling, myalgias, neck pain and stiffness, weakness, numbness, and headaches. (Tr. 1627.) On physical examination, Ms. Barkhauer ambulated unassisted with a normal gait. (Tr. 1630.) Strength in the bilateral upper and lower extremities was 5/5. (*Id*.) She was sensitive to light palpation. (*Id*.) She was diagnosed with fibromyalgia, somatic dysfunction of the lumbar region, and chronic pain. (*Id*.) CNP Mansfield explained that a large component of her chronic pain was somatic in nature, and that follow up with her psychiatric team and treatment would be most beneficial. (*Id*.) CNP Mansfield also encouraged Ms. Barkhauer to refrain from a prolonged sedentary lifestyle and encouraged her to engage in light activity and regular aerobic exercise. (*Id*.) Ms. Barkhauer reported she was planning to start water therapy. (*Id*.) CNP Mansfield suggested Ms. Barkhauer might benefit from Cymbalta but

advised her to discuss it with her psychiatric team.  (Tr. 1631.)  CNP Mansfield also advised Ms. Barkhauer to follow up with neurology regarding her chronic intractable migraine.  (*Id*.)

Ms. Barkhauer participated in physical therapy for fifteen sessions between September 12, 2022, and December 15, 2022.  (Tr. 1594-96, 1797-99.)  She was discharged due to goal achievement and reaching maximal benefit.  (Tr. 1797.)  She was encouraged to stay active and perform her home exercises two to three times a week.  (*Id*.)

On November 17, 2022, Ms. Barkhauer presented to gastroenterologist Carol Rouphael, M.D., at the Cleveland Clinic for a new patient consult regarding iron deficiency, abdominal pain, and constipation.  (Tr. 1588.)  Her physical examination findings were unremarkable, except for tenderness to deep palpation in the abdomen.  (Tr. 1590.)  Dr. Rouphael recommended further testing for iron deficiency and constipation, and medication for constipation.  (Tr. 1592.)

On November 18, 2022, Ms. Barkhauer presented to Jennifer Drake, D.O., at NeuroCare Canton for evaluation of her seizures.  (Tr. 1864-67.)  Ms. Barkhauer's wife attended the visit.  (Tr. 1866.)  Ms. Barkhauer reported that she had not seen a neurologist for many years.  (*Id*.)  Ms. Barkhauer's wife reported that Ms. Barkhauer had been having a seizure once a week for the past year.  (*Id*.)  Ms. Barkhauer also reported having a migraine headache since 2014 that she described as being in the center of her forehead with constant aching and some stabbing and radiating to one side at times.  (*Id*.)  At times, she also had nausea and photophobia associated with her migraines.  (*Id*.)  She was taking Keppra 750 mg twice a day and gabapentin 800 mg twice a day, and three times a day when in pain.  (*Id*.)  An examination revealed normal strength, sensation, reflexes, coordination, and gait.  (Tr. 1867.)  Ms. Barkhauer was diagnosed with chronic intractable migraine without aura, seizure, and abnormal gait (noting that Ms. Barkhauer had falls and her knee gave out for no reason).  (*Id*.)  Dr. Drake prescribed Nurtec to be taken

daily for migraine prevention, and Maxalt to be taken at onset of a severe migraine. (*Id*.) Dr. Drake reduced Ms. Barkhauer's dose of Keppra, noting it was not the best medication for her given her underlying mental health conditions. (*Id*.) Dr. Drake also ordered an EEG and brain MRI for further evaluation of her seizures. (*Id*.)

Ms. Barkhauer received an iron infusion on November 21, 2022. (Tr. 1832-33.) Ms. Barkhauer's December 8, 2022 brain MRI was normal with a small developmental venous anomaly within the left parietal lobe. (Tr. 1873.) She had another iron infusion on December 13, 2022. (Tr. 1801.)

On February 28, 2023, Ms. Barkhauer presented to her primary care provider Roberto Lebron-Hernandez, M.D., complaining of body weakness, worsening fatigue, difficulty walking, and inability to open her fist. (Tr. 2021.) She denied abdominal pain, chest pain, and headaches. (*Id*.) Her BMI was 33.28. (Tr. 2025.) On examination, she was in no acute or respiratory distress. (*Id*.) Her musculoskeletal examination was normal. (*Id*.) Her neurological examination revealed generalized weakness, but no focal deficit, tremor, or atrophy. (*Id*.) Her mood was depressed, but she was not anxious, and her speech and behavior were normal. (Tr. 2025-26.) Ms. Barkhauer was diagnosed with chronic fatigue, irritable bowel syndrome with constipation, B12 deficiency, chronic anemia, fibromyalgia, and vitamin D deficiency. (Tr. 2028-29.) Dr. Lebron-Hernandez ordered additional lab work and recommended that Ms. Barkhauer follow up with neurology and rheumatology. (*Id*.)

On March 30, 2023, Ms. Barkhauer presented to Taylor Moresea, PA, at NeuroCare Canton. (Tr. 1854-58.) She had not yet started the reduced dose of Keppra that Dr. Drake had recommended; she was still taking 750 mg twice a day because she said that the pharmacy had not given her the new prescription. (Tr. 1857.) She reported having seizures about one to two

times each week since her last visit. (*Id*.) She said that stress seemed to be a trigger for her seizures. (*Id*.) When she had a seizure, she said it felt like an "impending sense of doom" and she felt panicked; an episode usually lasted a few minutes but had lasted as long as ten minutes. (*Id*.) She was really tired after an episode. (*Id*.) She reported some improvement with her migraines, and said she could definitely tell when she missed a dose. (Tr. 1857.) She still had some light and sound sensitivity all the time and did not feel that Maxalt 10 mg was very beneficial. (*Id*.) She also complained of a loss of balance, paresthesias in the arms and leg that was worse in the right hand, and tremors that affected her ability to hold on to things or perform fine movements. (*Id*.) She reported that she was getting iron infusions every six months. (*Id*.) Ms. Barkhauer's physical examination revealed clear speech and no tremors. (*Id*.) Ms. Barkhauer held on to her wife to stand and walk. (*Id*.) Ms. Barkhauer was diagnosed with chronic intractable migraine without aura, and it was recommended that she continue taking Nurtec 75 mg every other day. (Tr. 1858.) She was diagnosed with localization-related symptomatic epilepsy with a recommendation to reduce her Keppra dose to 500 mg twice daily. (*Id*.) She was also diagnosed with paresthesia and increased body mass index. (*Id*.) PA Moresea recommended a right-side EMG and neuropathy lab work. (*Id*.)

An MRI of the pelvis was performed on March 23, 2023, due to indications of pelvic pain and ankylosing spondylitis. (Tr. 183-84.) There were no findings of sacroiliitis. (*Id*.)

On April 14, 2023, Ms. Barkhauer returned to PA Moresea for follow up. (Tr. 1844-48.) On examination, Ms. Barkhauer's speech was clear, there were no tremors, and her gait was normal. (Tr. 1847-48.) PA Moresea noted that Ms. Barkhauer's prolonged EEG and EMG were normal. (Tr. 1848.) PA Moresea recommended that Ms. Barkhauer continue taking Keppra 500 mg twice daily for her seizures and Nurtec 75 mg every other day for her migraines. (*Id*.) PA

Moresea also recommended that she continue to take her gabapentin to address her paresthesia and noted they were waiting on the results of lab work to further assess her paresthesia. (*Id*.) Ms. Barkhauer was also diagnosed with abnormal gait, with a notation that Ms. Barkhauer's legs gave out. (*Id*.) PA Moresea noted that Ms. Barkhauer's legs giving out could be from nerve changes and it was recommended that Ms. Barkhauer continue with physical therapy to keep her muscles strong and prevent weakness episodes. (*Id*.) She was also diagnosed with increased body mass index. (*Id*.)

###  ii. Mental Health Impairments

Ms. Barkhauer received treatment for her mental health impairments at Coleman Professional Services ("Coleman") starting in April 2016. (Tr. 882-98.) Her first counseling session was with Brittany Reed, PC, on April 21, 2016. (Tr. 589-92.) She reported anxiety, panic attacks, and feeling lonely, depressed, and scared when alone. (Tr. 590.) She reported that her anxiety had gotten to the point that it was impacting her relationships and she felt like her life was out of control. (Tr. 590-91.) She reported that her strengths included being "'peaceful, passionate, always a good mediator, really good with animals, and . . . [being] a dog trainer.'" (Tr. 592.) On mental status examination, Ms. Barkhauer was well-groomed and cooperative with an average demeanor, average eye contact, and clear speech. (Tr. 589.) She had an anxious mood with congruent affect. (*Id*.) She reported no delusions and no suicidal or homicidal ideation. (Tr. 589-90.) She denied current tactile hallucinations, but she reported a history of feeling like bugs were crawling up her arms and "prickly skin." (Tr. 590.) Her thought process was logical with no impairment in memory or attention/concentration; her intelligence was estimated to be average; and her insight/judgment were adequate. (*Id*.)

Ms. Barkhauer returned for counseling sessions with PC Reed on May 5, 2016 (593-96),

May 26, 2016 (Tr. 597-600), June 9, 2016 (Tr. 601-04), June 23, 2016 (Tr. 605-08), July 7, 2016

(Tr. 609-12), August 3, 2016 (Tr. 613-16), August 17, 2016 (Tr. 617-20), September 13, 2016

(Tr. 621-24), September 24, 2016 (Tr. 625-28), November 3, 2016 (Tr. 629-32), November 17,

2016 (Tr. 633-36).  When Ms. Barkhauer saw PC Reed on September 27, 2016, she reported she

was "tired" and said she had a "panic attack like all day" the day before and could not get herself

under control due to work.  (Tr. 625.)  She said she was planning to do a suicide prevention walk

on the weekend.  (*Id*.)  At her appointment with PC Reed on November 3, 2016, Ms. Barkhauer

reported she was "off and on kinda panicky" but had been "in better moods."  (Tr. 629.)  Mental

status examination findings during 2016 appointments with PC Reed were similar to those

observed during her April 21, 2016 appointment, except her eye contact was avoidant (Tr. 609,

613, 617, 621, 625, 629, 633) and her mood was described at times as dysthymic (Tr. 613, 621)

and tired (Tr. 625).  There were no tactile hallucinations noted.  (Tr. 594, 598, 602, 606, 610,

614, 618, 622, 626.)

Ms. Barkhauer also saw a Michelle Garrett, CNP, BC, RN, DEA, at Coleman for

psychiatric treatment.  (Tr. 899-904, 905-10.)  When Ms. Barkhauer first met with CNP Garrett

on November 7, 2016, her demeanor was described as average.  (Tr. 900.)  Her eye contact was

good, and her speech was clear.  (*Id*.)  She was anxious at times with a full affect.  (*Id*.)  Her

thought process was logical, but her thought content was noted to be preoccupied with "health

and very somatic complaints [with] extreme response to minimal stimuli."  (Tr. 900-01.)  There

was no reported suicidal or homicidal ideation.  (Tr. 901.)  There was no noted cognitive

impairment, but Ms. Barkhauer's insight and judgment were noted to be fair/poor.  (*Id*.)  CNP

Garrett prescribed Prozac 10 mg daily.  (Tr. 903.)  When Ms. Barkhauer returned to CNP Garrett

17

on December 29, 2016, she reported Prozac was helping with her depression, but was not helping much with her anxiety.  (Tr. 905.)  She reported feeling more "even" with not as many "ups and downs"; she had more energy but was having more panic attacks and seizures since running out of gabapentin due to insurance reasons.  (*Id*.)  CNP Garrett instructed Ms. Barkhauer to increase her Prozac to 30 mg for two weeks and then to 40 mg.  (Tr. 909.)  She also instructed Ms. Barkhauer to take 300 mg gabapentin for anxious mood and discussed using over the counter melatonin to help with falling asleep.  (*Id*.)

Ms. Barkhauer continued to see CNP Garrett and PC Reed in 2017.  On January 30, 2017, CNP Garrett continued Ms. Barkhauer's prescriptions for Prozac 40 mg once a day and gabapentin 300 mg three times a day as needed.  (Tr. 912.)  When Ms. Barkhauer returned to CNP Garrett on March 13, 2017, she reported doing well on Prozac and having more confidence, noting she recently taught an aromatherapy class.  (Tr. 917.)  On mental status examination, Ms. Barkhauer's mood was described as "less depressed and anxious"; her affect was full; she had clear speech and good eye contact; her demeanor was average; her thought process was logical; her thought content and cognitive impairment were unremarkable; and her insight/judgment was fair.  (Tr. 918-19.)  When Ms. Barkhauer returned to PC Reed on March 27, 2017, she reported a "big improvement with moods . . . [and] more energy."  (Tr. 637.)  She said she was still struggling with panic attacks, but was able to function better and could control herself before her anxiety got "really bad."  (*Id*.)  She obtained insurance again and medication was helping.  (*Id*.)  She reported family stressors, but also reported she had taught an aromatherapy class.  (*Id*.)  PC Reed praised Ms. Barkhauer for getting outside her comfort level and teaching the class.  (Tr. 640.)  Ms. Barkhauer was active and engaged during her session and was receptive to interventions.  (*Id*.)

18

On June 5, 2017, Ms. Barkhauer returned to CNP Garrett, reporting increased stress due to finances, and trying to find a place to live. (Tr. 923.) She reported higher anxiety and having panic attacks and increased pseudo seizures. (*Id*.) She reported taking her medications and said Prozac helped to some extent. (*Id*.) Ms. Barkhauer's mental status examination findings were similar to those recorded at her March 13, 2017, appointment, except her mood was described as "depressed and anxious." (*Compare* Tr. 925-26 *with* Tr. 918-19.) CNP Garrett adjusted Ms. Barkhauer's Prozac dose from 40 mg once a day to 60 mg once a day. (Tr. 924.)

Ms. Barkhauer continued to attend counseling sessions with PC Reed from June through August 2017. (Tr. 653-56, 657-60, 661-64, 665-68, 669-70.) During a July 5, 2017 session, Ms. Barkhauer reported her seizures were getting worse due to increased familial stressors. (Tr. 657.) Her mood was "worried." (*Id*.) On July 26, 2017, she reported moving into a two-bedroom apartment. (Tr. 661.) Her mood was "within normal limits." (*Id*.) On August 9, 2017, Ms. Barkhauer reported feeling "'OCD' about kinetic sand 'not being organized.'" (Tr. 665.) Her mood was anxious. (*Id*.) Otherwise, her mental status examination findings were average or unremarkable. (Tr. 665-66.) On August 22, 2017, Ms. Barkhauer reported her primary care provider put her back on Keppra for seizures and she was only having a seizure if she missed a dose. (Tr. 669.) She was calm and cooperative on mental status examination with clear speech, logical thought process, and adequate insight/judgment. (Tr. 669-70.)

In September 2017, Ms. Barkhauer saw PC Reed for counseling (Tr. 673-77, 678-81, 682-85) and CNP Garrett for medication management (Tr. 929-34). During Ms. Barkhauer's session with PC Reed on September 6, 2017, she reported a recent suicide attempt that did not require hospitalization; she denied current suicidal thoughts, plan, or intent. (Tr. 673-74.) Ms. Barkhauer returned to PC Reed on September 18, 2017, reporting she had been hospitalized after

her friend became concerned that she was going to attempt suicide again.  (Tr. 678.)  A few days later, on September 21, 2017, Ms. Barkhauer returned to PC Reed, reporting she was in a pretty good mood.  (Tr. 682.)  She reported going to art therapy and enjoying it.  (*Id*.)

On September 27, 2017, Ms. Barkhauer returned to CNP Garrett, after not seeing CNP Garrett since the beginning of the summer.  (Tr. 929, 933.)  She reported she was diagnosed with bipolar depression and prescribed risperidone when she was recently hospitalized.  (Tr. 929.) She said she could not take the risperidone because she felt her heart was going to beat out of her chest.  (*Id*.)  But she also said she felt her depression was improving with counseling IOP and art therapy.  (*Id*.)  On mental status examination, Ms. Barkhauer's demeanor was average, her eye contact was good, her speech was clear, her mood was euthymic, her affect was full, her thought process was logical, and her thought content was unremarkable.  (Tr. 931- 32.)  CNP Garrett noted that Ms. Barkhauer's insight was fair and her judgment was poor, observing that Ms. Barkhauer did not take her medication correctly, needed a lot of attention, and had poor coping skills.  (Tr. 932.)  It was noted that Ms. Barkhauer had a safety plan in place to deal with her fleeting suicidal thoughts.  (*Id*.)  Ms. Barkhauer's diagnoses included: major depressive disorder in partial remission, single episode; social anxiety disorder; borderline personality disorder; conversion disorder with attacks or seizures; and dependent personality disorder.  (*Id*.)  CNP Garrett noted that they would continue to monitor for symptoms of a nonspecific bipolar disorder; she continued Ms. Barkhauer on Prozac and encouraged counseling.  (Tr. 933.)

When Ms. Barkhauer returned to PC Reed on October 26, 2017, she reported being depressed and having a "rough" and "low" day.  (Tr. 694.)  On mental status examination, she was depressed and her affect was congruent.  (*Id*.)  There were no reported suicidal thoughts. (*Id*.)  She reported having a lot of pain physically and said she had a difficult time

20

communicating with others when she was in a lot of pain, noting that other people thought she was being mean when she was "utilizing skills" because they were not "'used to [her] being assertive and putting boundaries down.'"  (Tr. 695.)

On November 9, 2017, she returned to PC Reed, reporting she was back to work a couple of hours each day at her family's pharmacy and had a rough day the day before.  (Tr. 698.)  She reported being frustrated with her roommate.  (*Id*.)  On mental status examination, she was well-groomed and cooperative.  (*Id*.)  Her eye contact was average, and her speech was clear.  (*Id*.)  She said her mood was "okay," but she was worried and frustrated.  (*Id*.)  There were no reported suicidal thoughts, and her thought process was logical.  (Tr. 698-99.)

On November 28, 2017, Ms. Barkhauer returned to CNP Garrett.  (Tr. 935-40.)  She reported working at her family's pharmacy on an as needed basis; since her family owned the business, she said she could come and go when she felt like working.  (Tr. 935.)  She reported depression and low moods but said she had more good days than bad days.  (*Id*.)  She enjoyed going to her friends' farm to care for animals and writing.  (*Id*.)  She reported no suicidal ideation.  (*Id*.)  She said she had high anxiety in social and work settings and high stress at home. (*Id*.)  On mental status examination, Ms. Barkhauer's insight/judgment were fair to poor.  (Tr. 938.)  Mental status examination findings were otherwise unremarkable or normal.  (Tr. 937-38.) CNP Garrett continued Ms. Barkhauer on Prozac at 60 mg per day.  (Tr. 939.)

At an internal medicine visit with Dr. Modlo for abdominal pain on January 3, 2018, Ms. Barkhauer denied anxiety or depression.  (Tr. 456-47.)  She returned to PC Reed a few weeks later, on January 23, 2018, reporting increased depression and trauma-related symptoms.  (Tr. 702.)  She said she was "kinda withdrawing from everyone," and had increased nightmares and

flashbacks because of her roommate's behaviors.  (Tr. 703.)  On examination, she was withdrawn and depressed with a constricted affect, but denied suicidal ideation.  (Tr. 702-03.)

On February 27, 2018, Ms. Barkhauer returned to CNP Garrett.  (Tr. 941.)  She reported social anxiety and having a lot of "overstimulation."  (*Id*.)  She reported financial stressors and feeling stressed about starting a family.  (*Id*.)  Her depression was up and down, with fleeting thoughts of self-harm but no suicidal ideation.  (*Id*.)  She was working on mindfulness through coloring, working with her dog, and crocheting.  (*Id*.)  She had increased PTSD, and was hypervigilant, guarded, and irritable with nightmares and flashbacks.  (*Id*.)  Mental status examination findings were unremarkable or normal, except it was noted that Ms. Barkhauer's insight/judgment was fair to poor.  (Tr. 943-44.)  Ms. Barkhauer declined medication to treat her nightmares.  (Tr. 945.)  Her prescription for Prozac 60 mg was continued.  (*Id*.)

Ms. Barkhauer continued to attend counseling sessions with PC Reed through July 2018 (Tr. 712-15, 724-27, 740-43, 752-55, 760-63), reporting trauma-related symptoms, including nightmares, depression (Tr. 712), and familial stressors (Tr. 740, 752, 760).  At her July 26, 2018 counseling session with PC Reed, her mental status examination revealed a well-groomed appearance, average demeanor, cooperative behavior, average eye contact, and clear speech.  (Tr. 760.)  Ms. Barkhauer's mood was described as "stressed" and worried.  (*Id*.)  She had a full affect, no delusions or hallucinations, no suicidal or homicidal ideation, a logical thought process, no reported impairment of memory or attention/concentration, average intelligence, and fair insight and judgment.  (Tr. 760-61.)

In May and June 2018, Ms. Barkhauer met with Cindy Shapuite, PCC, LISW, at Coleman for DBT group therapy.  (Tr. 716-23, 728-31, 732-35, 736-39, 744-47, 748-51, 756-

59.)  During her initial DBT group session, Ms. Barkhauer reported her anxiety could be paralyzing, and she tended to withdraw.  (Tr. 721.)

Ms. Barkhauer also continued to see CNP Garrett in 2018, meeting with her in May (Tr. 947), August (Tr. 953), and November (Tr. 959).  She reported struggling with anxiety and PTSD.  (Tr. 947, 953, 959.)  Anxiety was noted on her May and August mental status exams.  (Tr. 949, 955.)  In August, Ms. Barkhauer agreed to add hydroxyzine for anxiety.  (Tr. 957.)  During an annual examination in October 2018, Ms. Barkhauer denied anxiety, depression, and memory loss, and was described as cooperative.  (Tr. 440.)  When Ms. Barkhauer returned to CNP Garrett in November 2018, she continued to report stress and anxiety, but reported less depression, panic, and PTSD symptoms.  (Tr. 959.)  On mental status examination, she was cooperative, with a euthymic mood and intact associations.  (Tr. 961.)

Ms. Barkhauer continued to see CNP Garrett in 2019, with appointments in February (Tr. 965), March (Tr. 971), April (Tr. 977), June (Tr. 984), August (Tr. 991), September (Tr. 998), and November (Tr. 1005).[2]  On March 13, 2019, Ms. Barkhauer returned to CNP Garrett for an extra visit due to increased stress following a fight with her friend and neighbor.  (Tr. 971.)  She denied suicidal or homicidal ideation but was worried about her anxiety, which she reported was very high, and reported feeling sad since the fight.  (*Id*.)  On mental status examination, Ms. Barkhauer's mood and affect were "depressed sad full slight blunted affect congruent with mood."  (Tr. 973.)  Ms. Barkhauer was encouraged to go to counseling.  (*Id*.)  CNP Garrett continued Prozac and hydroxyzine and added Buspar for mood and anxiety.  (Tr. 975.)

Ms. Barkhauer returned to CNP for an early recheck in April because of her increased depression at her last visit.  (Tr. 977.)  She was euthymic and happy and reported that Buspar

---

[2] While Ms. Barkhauer continued to see CNP Garrett throughout 2018 and 2019, Ms. Barkhauer did not attend individual counseling sessions from mid-2018 until January 2020.  The ALJ noted this gap in counseling.  (Tr. 22.)

was "working wonderful." (*Id*.)  She had secured a job at an animal shelter working with animals and adopting them out. (*Id*.)  But she also reported feeling somewhat overwhelmed because she was fostering a lot of the animals. (*Id*.)  They discussed setting boundaries between work and home. (*Id*.)  CNP Garrett observed that Ms. Barkhauer was doing better, noting it appeared she had made up with her neighbor and was focused on her job. (Tr. 982.)

In June 2019, Ms. Barkhauer reported increased stressors at work because a number of animals died due to illness. (Tr. 984.)  Her mood was anxious, and her affect was full. (Tr. 986.) When Ms. Barkhauer returned to CNP Garrett on August 1, 2019, she reported she was on medical leave from work, and did not think she could return due to stress. (Tr. 991.)  CNP Garrett encouraged Ms. Barkhauer to resume DBT therapy but Ms. Barkhauer refused at that time. (Tr. 994.)  CNP Garrett noted that refills for Ms. Barkhauer's medications were not provided because Ms. Barkhauer was not taking her medications correctly and CNP Garrett wanted to prevent stocking. (Tr. 996.)

Ms. Barkhauer returned to CNP Garrett on September 15, 2019, reporting she was in more control and doing better with taking her medication, but was still missing about three doses a week. (Tr. 998.)  On examination, Ms. Barkhauer was depressed with a full affect. (Tr. 1001.) She was cooperative with normal eye contact, and her thought process was logical. (*Id*.)  In November, CNP Garrett did not refill Ms. Barkhauer's prescriptions because she was not taking them daily. (Tr. 1010.)  CNP encouraged Ms. Barkhauer to take her medications as scheduled to improve her symptoms and mood, and continued to encourage counseling. (*Id*.)

In 2020, Ms. Barkhauer continued medication management with CNP Garrett¸ with appointments in January (Tr. 1012), April (Tr. 1019), June (Tr. 1026), and December (Tr. 1033). She continued to report stress and anxiety (Tr. 1012, 1019, 1026, 1033) and continued to appear

depressed on mental status examination (Tr. 1015, 1022, 1028).  CNP Garrett limited refills of Ms. Barkhauer's medications because Ms. Barkhauer continued to be noncompliant and CNP Garrett did not want stock piling of medications.  (Tr. 1024, 1030, 1038.)

On January 30, 2020, Ms. Barkhauer resumed counseling at Coleman.  (Tr. 765.)  She started seeing Alyssa Aquino, PC.  (Tr. 765-69.)  Ms. Barkhauer reported financial and familial stressors.  (Tr. 765.)  She also reported her wife and friends/housemates were positive supports in her life, and that her coping skills included "diamond art" painting and caring for animals.  (Tr. 766.)  Her mental status examination findings were unchanged from findings at her last counseling session in July 2018.  (*Compare* Tr. 765-66 *with* Tr. 760-61.)

Ms. Barkhauer met with PC Aquino on March 26, 2020, for a telehealth session.  (Tr. 784, 787.)  She reported that her "stress and anxiety [were] through the roof" due to COVID-19.  (Tr. 784.)  She said she was spending more time outdoors and crafting, and was planning to sew and donate face masks to medical providers.  (Tr. 787.)  She met with PC Aquino for telehealth counseling sessions in April and May.  (Tr. 789, 793, 797, 801.)  During these sessions, she reported worry and anxiety given the pandemic.  (Tr. 789, 794, 797, 802.)  She was trying to stay busy and active to help manage her anxiety (Tr. 797.)  She was spending time outdoors, working on the farm, spending time with loved ones, and focusing on self-care.  (Tr. 789, 793, 797.)

Ms. Barkhauer resumed telehealth counseling sessions with PC Aquino on September 2, 2020.  (Tr. 805.)  She reported it had been "a rough few months" because her wife fell and suffered a head injury that required an extensive recovery period.  (*Id*.)  She said it was a difficult time and she had to push herself "go outside of her comfort zone and reduce anxieties in some areas, such as driving."  (Tr. 808.)  She said she had managed it because she had no other choice and was proud of herself.  (*Id*.)  She continued to see PC Aquino at least once a month through

25

December 2020.  (Tr. 809-25.)  In November 2020, she reported occasional depression that she described as "bubbling up."  (Tr. 813.)  She also reported anxiety regarding a household member's potential exposure to COVID-19.  (Tr. 817.)  During a December 9, 2020 counseling session, Ms. Barkhauer reported anxiety about an upcoming surgery to remove a mass from her back.  (Tr. 820.)  When Ms. Barkhauer returned for a session with PC Aquino on December 23, 2020, she reported relief in learning that the removed mass was benign.  (Tr. 823.)

In 2021, Ms. Barkhauer continued meeting with PC Aquino for individual counseling sessions at least once a month.  (Tr. 826-81.)  She also continued to see CNP Garrett for medication management, meeting with her in March (Tr. 1040), May (Tr. 1047), July (Tr. 1054), September (Tr. 1061), and November (Tr. 1069).  During sessions with CNP Garrett, Ms. Barkhauer reported financial and familial stressors, depression, and anxiety.  (Tr. 1040, 1047, 1054, 1061, 1069.)  In early 2021, she reported compliance with her medications (Tr. 1040), but starting in May, she was not staying compliant with taking her medications as prescribed (Tr. 1047, 1054, 1061, 1069, 1075).

When Ms. Barkhauer met with PC Aquino on January 13, 2021, she reported that recent political events caused her fear and anxiety, but she was "taking it one day at a time."  (Tr. 827.)  She also reported issues with her physical health that she said were "exhausting to manage," but said she was continuing to manage responsibilities at home and helping homeschool a young family member.  (*Id.*)  When Ms. Barkhauer met with PC Aquino the following month, on February 10, 2021, she reported increased anxiety and stress, but said she was doing "really well" with taking her medication.  (Tr. 829.)

In April, she told PC Aquino: "I am really stressed out.  I am still showing off a very positive mood but I am just exhausted mentally and physically."  (Tr. 841.)  She had to put down

26

one of her farm animals and was also concerned about her niece.  (*Id.*)  In May 2021, Ms.

Barkhauer reported that her anxiety was "through the roof," but she was able to manage and had

fewer panic attacks.  (Tr. 844, 845.)  She reported taking her medications more days than she

was missing.  (Tr. 844.)  Her niece and nephew were removed from their parents' home and Ms.

Barkhauer was hoping to get custody of her eldest niece.  (Tr. 845.)  She also reported she was

trying to fix up her residence and take time for self-care strategies, which included spending time

with one of her good friends.  (*Id.*)

In June 2021, Ms. Barkhauer told PC Aquino she had been struggling with depression on

and off, and reported familial stressors.  (Tr. 850.)  She recently learned that she did not get

custody of her niece and was experiencing increased physical pain.  (*Id.*)  In September 2021,

Ms. Barkhauer reported doing well since her last session.  (Tr. 862.)  Her grandparents helped

her get a new car after her car broke down.  (Tr. 862.)  She reported having a great time at a

PRIDE festival with her niece and other family, dog sitting for extra income, and enjoying caring

for her home, animals, and writing a novel.  (Tr. 862, 865, 866.)  In October, Ms. Barkhauer

reported she was pet sitting more frequently.  (Tr. 868.)  She said she anticipated her "seasonal

depression" would be kicking in soon.  (*Id.*)  In November 2021, Ms. Barkhauer reported

financial stressors since her wife was now working only one job.  (Tr. 874.)  Ms. Barkhauer was

"considering exploring SSI application and/or additional side jobs for extra income."  (*Id.*)

In 2022, Ms. Barkhauer continued meeting with PC Aquino for individual counseling

sessions.  (Tr. 1883-1900, 1922-27, 1936-38, 1946-54, 1962-64, 1973-77.)  She also continued to

see CNP Garrett for medication management, with appointments in February (Tr. 1978), April

(Tr. 1901), June (Tr. 1914), August (Tr. 1928), September (Tr. 1939), October (Tr. 1955), and

November (Tr. 1965).

On January 20, 2022, Ms. Barkhauer met with PC Aquino, reporting she could not focus or think due to brain fog and sluggishness from her medications and physical health concerns. (Tr. 1883.)  She reported ongoing anxiety and worry.  (*Id*.)  She was alert and oriented during the session.  (*Id*.)  As of February 2022, Ms. Barkhauer's diagnoses included: major depressive disorder, single episode, in partial remission; borderline personality disorder; social anxiety disorder (social phobia); conversion disorder; dependent personality disorder; and nonadherence to medical treatment.  (Tr. 1886.)  Her medications included Prozac, hydroxyzine, and Buspar. (Tr. 1887.)  Ms. Barkhauer reported ongoing stress, anxiety, and depression during visits with CNP Garrett.  (Tr. 1901, 1914, 1928, 1939, 1955, 1965, 1978.)  Although there was reported improvement in her medication compliance during 2022 (Tr. 1898, 2934), she still struggled with medication adherence (Tr. 1955, 1965, 1978).

Ms. Barkhauer continued to see PC Aquino for counseling sessions through at least April 2023.  (Tr. 1992-2000.)   She also saw CNP Garrett in January (Tr. 1983) and April 2023 (2001).

During a March 15, 2023 counseling session with PC Aquino, Ms. Barkhauer was alert and oriented, but her "emotional affect" was "reported and observed to be overwhelmed, anxious, and fatigued."  (Tr. 1995.)  She reported "recent and sudden health scares with her geese and dog."  (*Id*.)

When Ms. Barkhauer met with CNP Garrett on April 5, 2023, she reported anxiety and panic when leaving her home.  (Tr. 2001.)  She said she was trying to make herself go out, but that it was hard because she recently had a seizure after the stress of going out to a lot of places. (*Id*.)  She admitted to wishing she was not alive, but said she had no suicidal plan or intent.  (*Id*.) She was trying to manage her trauma symptoms and nightmares by using sleep tapes.  (*Id*.)  She admitted not taking all doses of her medication, saying Buspar was too sedating and made her

hungry.  (*Id.*)  A mental status examination revealed normal eye contact, normal speech, a "worried" mood, a full affect, unremarkable thought content, unremarkable cognition, and normal fund of knowledge.  (Tr. 2003-04.)  Her thought processes were logical, but there was stress relating to her housing.  (Tr. 2003.)  It was also noted that Ms. Barkhauer's insight and judgment needed improvement and DBT skills.  (Tr. 2004.)  Ms. Barkhauer's diagnoses included: major depressive disorder in partial remission, single episode; borderline personality disorder; social anxiety disorder (social phobia); post-traumatic stress disorder; conversion disorder with attacks or seizures; dependent personality disorder; and nonadherence to medical treatment.  (Tr. 2005-06.)  CNP Garrett encouraged Ms. Barkhauer to regularly take her medication.  (Tr. 2006.)  She also recommended DBT therapy and counseling.  (*Id.*)

### 2.    Relevant Opinion Evidence

On January 9, 2022, state agency medical consultant Steve McKee, M.D., completed a physical RFC assessment.  (Tr. 91-92.)  Dr. McKee opined that Ms. Barkhauer had the RFC to: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  (Tr. 91.)  Dr. McKee opined that Ms. Barkhauer could never climb ladders, ropes, or scaffolds and should avoid exposure to unprotected heights, dangerous machinery, commercial driving, fumes, odors, dusts, gases, poor ventilation, and environmental pollutants.  (Tr. 91-92.)  Upon reconsideration on July 7, 2022, state agency medical consultant Elizabeth Das, M.D., generally affirmed Dr. McKee's findings.[3]  (Tr. 119-20.)

---

[3] There were slight variations in the extent to which the physicians opined Ms. Barkhauer would need to avoid exposure to hazards.  Dr. McKee opined that she should avoid even moderate exposure to hazards (Tr. 91) and Dr. Das opined that Ms. Barkhauer should avoid all exposure to hazards (Tr. 120).

On January 3, 2022, state agency psychological consultant Irma Johnston, Psy.D.,
completed a mental RFC assessment.  (Tr. 92-93.)  Dr. Johnston opined that Ms. Barkhauer had
the RFC to: understand and remember simple, 1-3 step instructions in an unskilled work
environment; carry out 1-3 step tasks in a setting without demands for unusually fast pace or
high production; have brief, superficial interactions with coworkers, supervisors, and the public;
and adapt to a structured and predictable work setting with infrequent changes in their
responsibilities and expectations.  (Tr. 93.)  Upon reconsideration on June 21, 2022, state agency
psychological consultant Cindy Matyi, Ph.D., completed a mental RFC assessment.  (Tr. 121-
22.)  Dr. Matyi opined that Ms. Barkhauer had the RFC to: comprehend and remember simple
tasks; carry out simple tasks, maintain attention, make simple decisions, adequately adhere to a
schedule, and would need a relatively isolated workstation and supervisory support when first
learning job tasks; relate adequately on a superficial basis in an environment that entails
infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder
supervisor scrutiny, and she should not be expected to supervise or persuade others or be
expected to deal with the public; and adapt to a routine, predictable work setting with infrequent
changes in responsibilities and expectations. (*Id*.)

C.      **Plaintiff's Testimony and Functional Report**

1.      **Plaintiff's Testimony**

At the May 16, 2023 hearing, Ms. Barkhauer testified in response to questioning by the
ALJ and her attorney.  (Tr. 55-72.)  She said the main reasons she could not work were pain from
her migraines and fibromyalgia and her fear of seizures.  (Tr. 70.)  She also said: she could not
work because her migraines prevented her from being able to focus or be around sounds or
lights; her epileptic seizures and fibromyalgia pain had worsened; there were many days when it

was difficult for her to have anything touch her skin, especially her hands; she lost her balance when walking; and she had severe ADHD.  (Tr. 60-61.)

Ms. Barkhauer provided testimony regarding her headaches, stating she constantly had a headache.  (Tr. 62.)  She said some days were better than others, but her headache was never gone.  (*Id.*)  She estimated that for two to three days out of the week her headaches caused "less sensitivity" and she was able to do some things around the house, but the severity of her headaches was dependent on her activity level.  (*Id.*)  For instance, if she went out shopping, she said she would be "down for several days at a time."  (*Id.*)  She usually spent her days in her house, but she said she could tolerate some dim light and sunny days that were not too bright.  (Tr. 63.)  If she went outside, she stayed in the shade and wore sunglasses, but she tried to stay in dark or dimmer places every day.  (*Id.*)  When her headaches got worse, she said she would make sure she was in a dark room, and she was usually under blankets.  (Tr. 62-63.)  She also took her rescue medication, which helped take some of the edge off.  (Tr. 63.)  In the past, there were times that she went to the emergency room because her headaches got to the point that she was throwing up, but she said that "became pointless after a while because [she] just did the same thing at home [that] they did there."  (Tr. 63.)

Ms. Barkhauer testified that her seizures occurred no less than once or twice a week.  (Tr. 63.)  She explained that seizures happened more often when she was under stress or more active.  (*Id.*)  She reported that her most recent seizure happened three days before the hearing, and that several seizures occurred during the prior week.  (Tr. 64.)  When she had a seizure, her speech was very slurred, and her mouth went numb.  (Tr. 63.)  She did not recall much after blanking out from a seizure, but others told her that she would "just kind of go slack," nobody could speak to her, her limbs might twitch, and she might fall.  (Tr. 63-64.)  She reported feeling scared,

sluggish, and tired following a seizure. (Tr. 64.) After a seizure, she said she felt like she ran a marathon "but only [her] brain participated"; she was exhausted for a couple of days. (*Id.*)

Ms. Barkhauer said she had problems maintaining her balance while standing and walking, and that her legs gave out, primarily her left leg. (Tr. 64, 65.) She said she was dizzy on a fairly regular basis. (Tr. 64.) When she was dizzy, she would lose her balance and "just drop over," and try to catch herself on something. (*Id.*) She reported she most recently lost her balance earlier that day. (*Id.*) She also said she had injured herself in the past after losing her balance; she had rolled her ankles, bruised her knees, sprained her muscles, hit her head, and hurt her back. (Tr. 65.) She said she used a cane when walking in the past, to help with the falls, but she was not able to afford a new cane when her cane broke. (Tr. 70.) When she did have her cane, she said there were times that she would leave without her cane or would leave her cane behind because she was very forgetful. (*Id.*)

Ms. Barkhauer also testified to problems with her hands, including numbness, burning, and extreme pain. (Tr. 65.) She said some days she could open a water bottle, but on other days she could not turn a lid. (*Id.*) She had problems holding objects and also had problems with fine motor skills. (*Id.*) She was right-handed and reported having a "little bit of a tremor in [her] right hand." (*Id.*) She said she occasionally used a small Chromebook. (Tr. 65-66.) She could use the computer for about 15-20 minutes before her wrists and hands started to hurt and then she would not use her computer for several hours or until the next day. (Tr. 66.)

Ms. Barkhauer described her fibromyalgia pain as burning, stabbing, aching, and pin pricks affecting her entire body. (Tr. 67.) The pain was the worst in her hands and feet. (*Id.*)

Ms. Barkhauer reported problems staying on track and needing reminders. (Tr. 66-67.) She read books and could remember what she read the day before if it was of interest to her, but

she did not always remember it if she was not interested in the subject.  (Tr. 67.)  She generally did not watch television due to her migraines.  (*Id*.)

Ms. Barkhauer said she saw a counselor every other week for telehealth appointments and saw a case manager on opposite weeks to address her mental health symptoms, which she said included severe depression, anxiety, problems leaving her house and being in public, severe nightmares, sleep paralysis, night terrors, and crying.  (Tr. 67-69.)  She explained that she had PTSD, stemming from a traumatic childhood, which prevented her from being able to use public transportation (Tr. 57), and made it very difficult for her to be around the general public without someone she knew (Tr. 71).  She said medication helped with her crying, but that she did not handle criticism well and would just break down into tears.  (Tr. 69.)  She reported medication side effects that included fatigue, dizziness, dry mouth, brain fog, and difficulty thinking and concentrating.  (*Id*.)  She tried group therapy, but it was not very helpful because there were too many people.  (Tr. 72.)  She said she was hospitalized once in 2016 for a suicide attempt.  (*Id*.)

Ms. Barkhauer estimated that she had very bad days that caused her to stay in bed all day three to four days a week.  (Tr. 70.)  The more she did, the more her symptoms were exacerbated.  (*Id*.)  For instance, if she went to the grocery store, she could not shop for more than 30-45 minutes and would end up in bed for two days.  (*Id*.)  As far as performing household chores, Ms. Barkhauer said she would try to feed the poultry in the morning, she wiped down counters "here and there" when she could, and she changed the litter box if she was having a good day.  (Tr. 56-57.)  Ms. Barkhauer did not cook; someone else in the house cooked so she only had to reheat food.  (Tr. 57.)  Ms. Barkhauer said her spouse assisted her with activities of daily living, which included anything from dressing and bathing on bad days.  (*Id.*)  Other household members also kept an eye on her because of her seizures, helped her care for her

33

animals, and drove her places.  (*Id.*)  She said her doctors recommended that she not drive.  (*Id.*)
She reported that the last time she drove was around 2019, when no one was home and she had
to get herself to the emergency room.  (*Id.*)

### 2. Plaintiff's Function Report

As part of her disability application, Ms. Barkhauer completed a Function Report on
January 10, 2022.  (Tr. 312-19.)  She reported that the following conditions affected her ability to
work: constant severe pain that limited her mobility and ability to stay on task; balance
problems; fainting spells; seizures; ADHD that caused severe executive dysfunction and memory
loss; migraines that caused excruciating pain when they spiked above her pain tolerance and
occasional vision loss; and PTSD that made social situations very uncomfortable.  (Tr. 312.)

Ms. Barkhauer reported: she needed reminders; she could heat up leftovers and make a
sandwich but could not make a complete meal; and she helped with some small chores at home,
like folding laundry, wiping down counters, and taking turns changing the litter pan or feeding
the animals.  (Tr. 313, 319.)  She occasionally took her dogs for a walk.  (Tr. 319.)  As far as
hobbies, she enjoyed reading, writing, sewing, crocheting, hiking, traveling, swimming,
horseback riding, dog sports, and gardening, but she was really only able to read and write and
swim occasionally.  (Tr. 314.)  The other hobbies were too difficult for her given her conditions.
(*Id.*)  With respect to her social interactions, she reported living with friends, so she was not
required to leave the house to socialize.  (*Id.*)  She video chatted once a month with a writer's
group for support and encouragement and communicated with other friends online.  (*Id.*)
Otherwise, her outings consisted of going to the store, going to doctor appointments, visiting her
mother once a month if able to do so, and occasionally meeting a friend for coffee.  (*Id.*)  When
she did leave the house, she said she never left without a family member or close friend.  (*Id.*)

Ms. Barkhauer reported that she did not do well with stress or changes in routine.  (Tr. 315.)  She said her seizures were stress induced and changes in routine could lead to a panic attack.  (*Id*.)  She said her PTSD made it was difficult for her to trust others.  (*Id*.)  And she said men made her extremely uncomfortable and caused full panic attacks at times.  (*Id*.)

Ms. Barkhauer reported taking gabapentin, Keppra, and Prozac and said they all caused side effects.  (Tr. 316.)  Gabapentin caused drowsiness, trouble thinking / foggy mind, and severe dry mouth; Keppra caused fatigue; and Prozac caused lack of appetite and apathy.  (*Id*.)

Ms. Barkhauer reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, complete tasks, concentrate, follow instructions, and use her hands.  (Tr. 317.)  She did not report using a cane.  (Tr. 315.)  She said she could usually dress herself, but she needed help from her spouse several times a week due to pain or dizziness.  (Tr. 319.)  She could usually bathe herself, but she did so only when someone else was home in case she fell.  (*Id*.)  She said she kept her hair short because it was hard to care for it.  (*Id*.)  She could not shave because it was difficult to bend.  (*Id*.)  She could feed herself, but there were times she did not eat because she was exhausted or nauseated.  (*Id*.)

## D.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the May 16, 2023 hearing.  (Tr. 72-82.)  She classified Ms. Barkhauer's past work as: (1) a composite job, consisting of pharmacy technician and retail clerk, each a semi-skilled, light level job, performed by Ms. Barkhauer at the light level; and (2) dog groomer, a semi-skilled, medium level job, performed by Ms. Barkhauer at the very heavy level.  (Tr. 75.)  In response to the ALJ's first hypothetical (Tr. 76-77) which mirrored the ALJ's RFC assessment (Tr. 18), the VE testified that the described individual could

not perform Ms. Barkhauer's past work but could perform light, unskilled jobs such as cleaner, mail clerk, and officer helper (Tr. 77).

For the second hypothetical, the VE testified that modifying the first hypothetical from frequent to occasional handling and fingering would eliminate the identified jobs and make the hypothetical close to work preclusive. (Tr. 77.)

For his third hypothetical, the ALJ asked the VE to consider the first hypothetical at the sedentary level. (Tr. 77-78.) The VE testified that the jobs of document preparer, final assembler, and sorter would be available to the described individual, but that there would be no jobs available if the hypothetical was reduced to occasional fingering and handling. (Tr. 78.)

The ALJ asked the VE whether there would be jobs available if the VE considered hypothetical one or three, but with the social interaction limitation reduced as follows: there could still be occasional interaction with supervisors in a non-public work setting, but the individual would otherwise have to work in isolation and have no interaction or contact with not only the general public but also coworkers. (78-79.) The VE testified that the previously identified jobs would not be available and there would no other jobs available. (Tr. 79.) The ALJ then asked the VE whether there would be jobs available if the VE considered hypothetical one or three, with the following additional limitation: the individual would occasionally need redirection or extra supervision to stay on task. (*Id*.) The VE testified that the previously identified jobs would not be available and there would be no other jobs available. (*Id*.) The VE testified that the general tolerance for off-task time was no more than 10% of the workday, and the general tolerance for absenteeism, including arriving late and leaving early, was no more than eight absences per year. (Tr. 79-80.)

In response to follow up questions from Ms. Barkhauer's counsel, the VE testified that cleaner was the only identified job that would remain available if the individual described in the first or third hypothetical was limited to performing tasks that included one to three steps.  (Tr. 80-81.)  If the individual was limited to brief or very limited interaction with others, the VE testified that would be the same as working in isolation and would be work preclusive.  (Tr. 81.) The VE also testified that there would be no work available if an individual could work for two hours but then required a break to lie down for an hour in a separate room, or if the individual required a family member or friend to accompany her in the work setting.  (*Id.*)  Ms. Barkhauer's counsel asked how many seizures an employer would tolerate before concluding it was not safe for the individual to be at work.  (*Id.*)  In response, the VE testified: "Well, if the seizures are causing them to miss work and be absent, I would say it falls into the . . . absenteeism."  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.     The ALJ's Decision

In his May 25, 2023 decision, the ALJ made the following findings:[5]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.  (Tr. 12.)

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

2.      The claimant has not engaged in substantial gainful activity since December 31, 2014, the alleged onset date.[6]  (Tr. 12-13.)

3.      The claimant has the following severe impairments: obesity, inflammatory spondylopathy at multiple sites in the spine/somatic dysfunction of the lumbar region [referred to collectively as the "spine disorder"], asthma, seizures / unspecified convulsions, benign positional paroxysmal vertigo / vasovagal syncope, ataxia, migraine headaches, Sicca syndrome, benign hypermobility joint syndrome, fibromyalgia, conversion disorder, depressive disorder, mood disorder, dysthymic disorder, anxiety disorder, social anxiety disorder, panic disorder with agoraphobia, borderline personality disorder, dependent personality disorder, post-traumatic stress disorder, and attention deficit-hyperactivity disorder.  (Tr. 13.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-17.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant may frequently balance, may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; that claimant may frequently handle and finger with the bilateral upper extremities; the claimant may, no more than occasionally, be exposed to wetness, humidity, extremes of heat and cold, loud noise, bright lights [brighter than found in a typical office setting], vibration, and pulmonary irritants, including dust, odors, gases, fumes and poor ventilation; the claimant must avoid all exposure to unprotected heights, dangerous moving mechanical parts and commercial driving; the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a work setting free of high production-rate pace [as is found in assembly line work], which setting contemplates occasional changes in a routine and relatively predictable environment, which setting is non-public, which setting requires no more than occasional and superficial [defined as precluding group, tandem and collaborative tasks, as well as tasks involving the management of, direction of, or persuasion of others] interaction with co-workers and supervisors.  (Tr. 18-27.)

6.      The claimant has been unable to perform any past relevant work.  (Tr. 27.)

7.      The claimant was born in 1988, and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

---

[6] The claimant engaged in work activity during the relevant period but not at levels that generated substantial gainful activity.  (Tr. 12-13.)

8.  The claimant has at least a high school education.  (*Id*.)

9.  Transferability of job skills is not material to the determination of disability.  (Tr. 27-28.)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in national economy that the claimant can perform, including cleaner, mail clerk, and office helper.  (Tr. 28.)

Based on the foregoing, the ALJ determined that Ms. Barkhauer was not under a disability, as defined in the Security Act from December 31, 2014, through the date of the decision.  (Tr. 29.)

## V.  Plaintiff's Arguments

Plaintiff presents two assignments of error.  First, she argues the ALJ erred and the decision lacks the support of substantial evidence because the ALJ failed to properly evaluate her migraine headaches at Step Three.  (ECF Doc. 8, pp. 1, 10-14; ECF Doc. 11.)  Second, she argues the ALJ failed to properly evaluate her subjective symptoms.  (*Id*. at pp. 1, 14-23.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: The ALJ Properly Evaluated Plaintiff's Migraine Headaches at Step Three**

In her first assignment of error, Ms. Barkhauer argues that the Commissioner's decision lacks the support of substantial evidence because the ALJ did not properly evaluate her migraine headaches at Step Three under Listing 11.02B and SSR 19-4p.  (ECF Doc. 8, pp. 8-14; ECF Doc. 11.)  Specifically, she argues that (1) the ALJ was incorrect in saying he was "constrained against making an 'equals' finding relevant to migraine headaches" because "there was no independent medical expert in attendance at the hearing" (ECF Doc. 8, p. 11 (quoting Tr. 14)) and that (2) the ALJ failed to discuss the criteria of SSR 19-4p or the frequency of her migraines under Listing 11.02B (*id.* at pp. 12-14; ECF Doc. 11).[7]

In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of Ms. Barkhauer's migraine headaches.  (ECF Doc. 10, pp. 15-18.)  In particular, the Commissioner argues that: (1) Ms. Barkhauer has not met her burden to prove that she medically equaled a listing; (2) the ALJ's statements regarding the need for a medical expert to support a medical equivalence finding were consistent with the requirements of SSR 17-2p; and (3) the ALJ appropriately considered the impact of Plaintiff's migraines throughout the sequential evaluation, including at Step Three and when formulating the RFC.  (*Id.* at pp. 15-16.)

**1.      Legal Framework for Step Three Evaluation of Headaches**

At Step Three of the disability evaluation, a claimant is disabled if her impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of

---

[7] Ms. Barkhauer also argues that the ALJ "erred when he failed to discuss any effects the headaches would have on [her] ability to engage in substantial gainful activity on a full-time and sustained basis." (ECF Doc. 8, pp. 13-14.) The Court finds this argument was inadequately developed and therefore waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)).  The claimant bears the burden to prove that her condition meets or equals a listing.  *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)).  To do so, she "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing."  *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)) (alteration in original).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019), explaining: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing," *id*. at 44671.  While a claimant cannot "meet" a listing for headache—as no such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy.  *Id*.  SSR 19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

43

To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

(*Id.*)

To meet her burden to show that an impairment medically equals a listing, Ms. Barkhauer must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 404.1526(b)(2). Further, before an ALJ can find she medically equals a listing, the record "must" contain one of the following:

1. A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2. [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3. A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, 82 Fed. Reg. 15263, 15265 (March 27, 2017). Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert. *Id.* And if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

44

## 2.     The ALJ Appropriately Evaluated Plaintiff's Migraine Headaches

Ms. Barkhauer argues that the ALJ erred in evaluating her migraine headaches under SSR

19-4p and Listing 11.02B.  (ECF Doc. 8, pp. 10-14; ECF Doc. 11.)  The ALJ identified migraine

headaches as a severe impairment at Step Two (Tr. 13) but found Ms. Barkhauer's impairments

did not medically equal Listing 11.02 at Step Three, explaining:

> <u>No treating or examining physician has indicated findings that would satisfy the
> severity requirements of any listed impairment.</u> In reaching the conclusion that the
> claimant does not have an impairment or combination of impairments that meet or
> medically equal a listed impairment, <u>I also considered the opinion of the State
> Agency medical consultants who evaluated this issue at the initial and
> reconsideration levels of the administrative review process and reached the same
> conclusion</u> (20 CFR 404.1527, 416.927). All of the listings were considered in
> reaching this finding, with specific emphasis on listings 1.15, 1.16, 3.03, 3.14,
> 11.02 [relevant to the claimant's seizures], <u>11.02, [relevant to the claimant's
> migraine headaches]</u>, 12.04, 12.06, 12.07, 12.08, 12.11, 12.15, 14.09 [relevant to
> the claimant's fibromyalgia], 14.09 [relevant to the claimant's inflammatory
> spondylopathy], and 14.10.

(Tr. 14 (brackets in original) (underlining added).)  Additionally, the ALJ explained: "Relevant

to listing 11.02, as there was no independent medical expert in attendance at the hearing, I am

constrained against making an 'equals' finding relevant to migraine headaches."  (*Id*.)

Ms. Barkhauer argues first that the ALJ was "incorrect" in saying he was "constrained

against making an 'equals' finding relevant to migraine headaches" due to the lack of a medical

expert at the hearing, arguing "the relevant Ruling does not require a medical expert."  (ECF

Doc. 8, p. 11.)  The "relevant Ruling" she references is SSR 19-4p, which provides: "Primary

headache disorder is not a listed impairment in the Listing of Impairments (listings); however,

we may find that a primary headache disorder, alone or in combination with another

impairment(s), medically equals a listing."  SSR 19-4p, 84 Fed. Reg. at 44670-71.

But the language in SSR 19-4p simply outlines the mechanism through which a

"medically equals" finding may be reached for a primary headache disorder.  There is nothing in

SSR 19-4p's language that exempts such medical equivalence findings from the requirements of SSR 17-2p, which applies to all medial equivalence determinations.  SSR 17-2p, 82 Fed. Reg. 15263.  SSR 17-2p clearly states that the evidentiary record "must" contain a finding of medical equivalence by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level before an ALJ may find that a claimant medically equals a listing.  *Id.* at 15265.  Here, the ALJ noted that the state agency medical consultants had found Plaintiff did not medically equal a listing before asserting that the lack of an independent medical expert at the hearing level precluded him from "making an 'equals' finding relevant to migraine headaches." (Tr. 14.)  Those observations were both accurate and consistent with the requirements of SSR 17-2p.  Thus, Ms. Barkhauer's argument that the ALJ erred when he said he was constrained from making a medical equivalence finding due to the lack of a medical expert is without merit.

Ms. Barkhauer's additional arguments that the ALJ failed to discuss the criteria of SSR 19-4p and/or the frequency of the migraines under Listing 11.02B (ECF Doc. 8, pp. 12-13) are likewise unavailing.  First, since the ALJ found that the evidence did not support a medical equivalence finding, he was not required to "articulate specific evidence supporting his . . . finding" that the impairments did not medically equal Listing 11.02.[8]  *See* SSR 17-2p, 82 Fed. Reg. at 15265.  Second, as the Commissioner argues, it is evident that Ms. Barkhauer has not met her burden to "point to specific evidence that demonstrates [s]he reasonably could . . . equal *every requirement* of the listing."  *Sheeks*, 544 F. App'x at 642 (emphasis added).  While Ms. Barkhauer cites to records indicating she complained of headaches to her providers and testified to very frequent headaches (ECF Doc. 8, p. 11), she does not identify records showing, e.g., a

---

[8] SSR 17-2p provides that an ALJ "may ask for and consider evidence from medical experts." 82 Fed. Reg. at 15264.  But an ALJ is not required to call a medical expert, and Ms. Barkhauer has not argued that the ALJ failed in his duty to develop the record.  Accordingly, any such argument is waived and will not be considered.

"detailed description from an [acceptable medical source] of a typical headache event" or medical records establishing that her headaches met frequency requirements "despite adherence to prescribed treatment."  SSR 19-4p, 84 Fed. Reg. at 44671.  Finally, the ALJ "made sufficient factual findings elsewhere in his decision to support his conclusion[s] at step three."  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).  At Step Four, he provided a detailed discussion of Ms. Barkhauer's migraine headaches, where he recognized evidence conflicting with her testimony that her migraines were "constant, never going away," noted her unremarkable diagnostic scans, imaging, and clinical exams, and the gaps in her neurology treatment, and also highlighted evidence indicating she only began targeted migraine medications in 2023, with recent clinical notes indicating some improvement.  (Tr. 20-21.)

For all of the reasons set forth above, the Court finds the ALJ appropriately addressed medical equivalence as to migraine headaches under Listing 11.02, in accordance with the regulatory requirements, and that Ms. Barkhauer has not met her burden to demonstrate otherwise.  Accordingly, the Court finds that the first assignment of error lacks merit.

## C.    Second Assignment of Error: The ALJ Appropriately Evaluated Plaintiff's Subjective Symptoms

In her second assignment of error, Ms. Barkhauer argues the ALJ failed to properly evaluate her symptoms in accordance with SSR 16-3p.  (ECF Doc. 8, pp. 14-23.)  Specifically, she asserts that the ALJ (1) inappropriately focused on her conversion disorder diagnosis, when the symptoms of that disorder "are real and cause significant distress or problems functioning," (2) "erred when he ignored relevant medical evidence documenting Plaintiff's symptoms and

fatigue," and (3) made findings that were not supported by substantial evidence while failing to articulate a supportable rationale.[9]  (*Id.* at pp. 19-21.)

The Commissioner argues in response that the ALJ complied with 16-3p by discussing the subjective reports and objective evidence, acknowledging Ms. Barkhauer's subjective complaints, considering the factors set forth in SSR 16-3p, and concluding on that basis that Ms. Barkhauer's symptoms were not as disabling as alleged.  (ECF Doc. 10, pp. 18-25.)

### 1.     Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to

---

[9] Ms. Barkhauer also makes a conclusory assertion that the ALJ "failed to consider the combined effects of all [her] impairments and their related symptoms" under SSR 96-8p.  (ECF Doc. 8, p. 22.)  The Court finds this argument was inadequately developed and therefore waived.  *See McPherson*, 125 F.3d at 995-96.

which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247. There is no dispute that the first step is met in this case (Tr. 24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3). Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

### 2. The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints

Review of the ALJ's decision reveals the ALJ considered Ms. Barkhauer's subjective complaints at length, including: her allegations of pain; a constant migraine headache that never goes away; regular fainting spells and deficits of balance, which she attributed to fibromyalgia; hypermobility; chronic depression; anxiety; the effects of post-traumatic stress disorder; and attention deficit hyperactivity. (Tr. 18.) He considered her claims that these symptoms and impairments caused deficits in her ability to lift, squat, bend, stand, reach, walk, kneel, climb, and use her hands and deficits in her ability to remember and follow instruction, concentrate and complete tasks, be comfortable in social situations, and react appropriately to stressors and changes. (Tr. 18-19.) Consistent with SSR 16-3p, the ALJ then considered the medical evidence relating to her Ms. Barkhauer's medically determinable impairments, including objective diagnostic and examination findings, treatments prescribed to treat her conditions, and her response to treatment. (Tr. 19-23.) The ALJ observed that Ms. Barkhauer reported some improvement with the use of medication to treat her migraines and responded positively to

physical therapy. (Tr. 21.) He observed that Ms. Barkhauer was prescribed psychotropic medication to treat her mental health conditions and reported that the medication was effective when used, but that she had a history of non-adherence to medications to such an extent that she was diagnosed with non-adherence to medical treatment. (Tr. 22.) He also observed that Ms. Barkhauer's mental status examination findings were "consistently, albeit not universally, reported either mildly adverse, or benign." (Tr. 22-23.)

Consistent with SSR 16-3p, the ALJ also considered Ms. Barkhauer's reported daily activities, which consisted of preparing simple meals, helping with bigger dishes on holidays, engaging in light cleaning, folding laundry, feeding animals, changing litter pans, reading, writing, spending time with others in person and online, being able to drive when required to do so, being able to usually manage her personal hygiene, assisting with the care of her niece, working outdoors cutting brush, teaching an aromatherapy class, painting and working at "diamond art" for pleasure, crafting and sewing with housemates to make and donate facemasks during the pandemic, working on the farm where she lived, homeschooling a young child in the house, attending festivals, participating in mental health awareness walk, driving when her wife experienced a head injury, engaging in part-time work between 2016 and 2019, and "dog-sitting" for extra money in 2021 and 2022. (Tr. 23-24.) The ALJ then explained:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because during the hearing, the claimant reported a constant migraine headache that never goes away [hearing testimony], yet there are multiple reviews of symptoms in the evidence in which the claimant denies headaches or frequent, significant headaches []. She indicated that she stopped driving in September 2019 [hearing testimony], yet the treatment record indicates she took over household driving in 2020 after her wife had a head

50

> injury and an extended recovery []. She has conceded that a large portion of her pain is somatic in nature and acknowledged the need to follow closely with her psychiatric providers [] yet has been non-compliant with psychotropic medications to such an extent that she has been diagnosed with non-adherence to medical treatment []. On examinations, she has exhibited inconsistent and non-physiologic findings [], and "give-away" weakness on strength testing (12F/10). She has conflated SSI benefits with 'side jobs' as equally appropriate sources of extra income [].

(Tr. 24 (citations omitted) (emphasis added).)  Thus, the ALJ considered the factors set forth in SSR 16-3p, clearly articulated how he considered the evidence of record in making his findings, and made a determination that was supported by substantial evidence.

Ms. Barkhauer argues that the subjective symptom analysis remains inadequate because the ALJ improperly "focused on the fact that 'consistent with her conversion disorder diagnosis, the record is rife with comprehensive, but unrevealing, objective testing.'"  (ECF Doc. 8, p. 19 (citing Tr. 21-22).)  She asserts that the symptoms of conversion disorder "are real and cause significant distress or problems functioning."  (*Id.*)  But the ALJ did not find that Ms. Barkhauer had no symptoms resulting from her conversion disorder.  Instead, in finding that the limitations stemming from Ms. Barkhauer's physical impairments were "not as severe as alleged," the ALJ explained "consistent with her conversion disorder diagnosis, the record is rife with comprehensive, but unrevealing, objective testing [], attempting to address her extensive, varied, and non-specific complaints and symptoms []."  (Tr. 21-22 (citations omitted).)  Further, in support of his finding that Ms. Barkhauer's statements regarding the intensity, persistence, and limiting effects of her symptoms were "inconsistent," the ALJ explained: "She has conceded that a large portion of her pain is somatic in nature and acknowledged the need to follow closely with her psychiatric providers [] yet has been non-compliant with psychotropic medications to such an extent that she has been diagnosed with non-adherence to medical treatment []."  (Tr. 24.)  Thus, the ALJ acknowledged the impact of the conversion disorder diagnosis on the "extensive, varied,

and non-specific" nature of Ms. Barkhauer's physical complaints and the potential impact of her ongoing failure to comply with psychotropic treatments on her continued complaints of pain.  In this context, it is clear that the ALJ's discussion and consideration of Plaintiff's conversion disorder diagnosis does not undermine his evaluation of her subjective symptom reports.

Ms. Barkhauer also argues that the ALJ "erred when he ignored relevant medical evidence documenting Plaintiff's symptoms and fatigue."[10]  (ECF Doc. 8, p. 20.)  As Ms. Barkhauer acknowledges, the ALJ explicitly considered "how her obesity might cause fatigue that would affect her ability to function physically" in his Step Three analysis (Tr. 14), while noting at Step Four that there was "no direct medical evidence" indicating that Ms. Barkhauer's obesity caused "excess fatigue" (Tr. 19).  The ALJ also observed that Ms. Barkhauer "followed, in non-compliant fashion [], a regimen of anti-epileptic medication [], used with the side effects of fatigue," despite normal diagnostic and clinical findings and "conflicting information regarding the number and frequency of recurrence of her seizures."  (Tr. 20.)  He also noted that she "follows a regimen of the nerve conduction suppressant "Gabapentin" [], used with side effects of drowsiness, difficulties thinking, and dry mouth."  (Tr. 21.)  Having explicitly acknowledged and considered the potential impact of Ms. Barkhauer's reported fatigue, the ALJ also identified a laundry list of reported daily activities—including household chores, work on a farm, childcare and home-schooling, teaching classes, making crafts, attending festivals, and performing side-jobs and part-time work—that he found were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (Tr. 23-24.)  In this context, Plaintiff has failed to show that the ALJ erred by failing to consider her reported fatigue.

---

[10] Ms. Barkhauer also argues summarily that the ALJ "failed to support his decision when he failed to find any limitations related to [her] [reported] recurring fatigue."  (ECF Doc. 8, pp. 19-20.)  The Court finds this argument was inadequately developed and therefore waived.  *See McPherson*, 125 F.3d at 995-96.

For all of the reasons set forth above, the Court finds the ALJ appropriately addressed the subjective complaints, in accordance with regulatory requirements articulated in SSR 16-3p, and that Ms. Barkhauer has not met her burden to demonstrate otherwise.  Accordingly, the Court finds the second assignment of error lacks merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


April 15, 2025


                                    */s/Amanda M. Knapp*
                                    AMANDA M. KNAPP
                                    United States Magistrate Judge